[Cite as *In re C.F.*, 2026-Ohio-2165.]

IN THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
STARK COUNTY, OHIO

| | |
|---|---|
| IN THE MATTER OF:<br><br>C.F. (DOB: 10/17/2009)<br>E.F. (DOB: 10/17/2009)<br>D.F. (DOB: 12/17/2010)<br>K.G. (DOB: 8/5/2024) | Case No. 2025CA00119<br>2025CA00120<br>2025CA00121<br>2025CA00122<br><br><u>Opinion And Judgment Entry</u><br><br>Appeal from the Stark County Court of Common Pleas, Family Court Division, Case Nos. 2024 JCV00853, 2024 JCV00854, 2024 JCV00855, 2024 JCV 00897<br><br>Judgment:  Affirmed<br><br>Date of Judgment Entry: June 9, 2026 |

**BEFORE:** Craig R. Baldwin; Kevin W. Popham; Robert G. Montgomery, Judges

**APPEARANCES:** RICHARD D. HIXSON, for Plaintiff-Appellant; BRANDON J. WALTENBAUGH, Stark County JFS, for Defendant-Appellee.

*Baldwin, P.J.*

**{¶1}** The appellant, Mother, appeals the judgment of the Stark County Court of Common Pleas, Family Court Division, awarding permanent custody of C.F., E.F., D.F., and K.G ("the children") to the Stark County Job and Family Services Division ("the Agency"). The appellee is the Agency.

**STATEMENT OF FACTS AND THE CASE**

**{¶2}** On October 17, 2009, C.F. and E.F. were born, on December 17, 2010, D.F. was born, and on August 5, 2024, K.G. was born.

**{¶3}** On May 7, 2024, the Agency filed complaints alleging the dependency, neglect, and/or abuse of C.F., E.F., and D.F. On the same day, the trial court granted emergency temporary custody of them to the Agency.

**{¶4}** On August 1, 2024, the initial cases concerning C.F., E.F., and D.F. were dismissed for failure to obtain service over all necessary parties. The Agency refiled its complaints. Again, the trial court granted emergency temporary custody of them to the Agency.

**{¶5}** On August 7, 2024, the Agency filed a complaint alleging the dependency of K.G. The trial court granted the Agency temporary custody of K.G. as well.

**{¶6}** On August 27, 2024, the trial court found that C.F., E.F., and D.F. were dependent and placed them in the temporary custody of the Agency.

**{¶7}** On September 4, 2024, the trial court found K.G. to be dependent and placed K.G. in the temporary custody of the Agency.

**{¶8}** On April 4, 2025, the Agency filed motions seeking permanent custody of all four children.

**{¶9}** On June 10, 2025, the Guardian ad Litem filed his final report.

**{¶10}** On June 16, 2025, the appellant filed motions to extend the Agency's temporary custody of the children.

**{¶11}** On June 17, 2025, the trial court held a hearing on the pending motions.

**{¶12}** At the hearing, Cortaise Rogers testified that he is employed by the Agency as a caseworker assigned to this case. The Agency became involved with the family due to an incident in April of 2024 in which E.F. was charged with domestic violence after attempting to defend herself from Mother, and a second incident in May of 2024 in which Mother was charged with domestic violence after holding C.F. down and attempting to

cut her shirt off. The Agency also had additional concerns regarding domestic violence against K.G. by K.G.'s father and his presence in the home as a registered sex offender. K.G.'s father was convicted of Unlawful Sexual Conduct with a Minor in 2021. He did not engage with the Agency throughout the case.

{¶13} Mr. Rogers also testified that the Agency created a case plan that was approved and adopted by the trial court. The plan initially required Mother to complete a drug screen and a parenting evaluation, and to follow all resulting recommendations. Mother completed a parenting evaluation through Lighthouse Family Center, and the report was admitted into evidence. The report was generated approximately six months after the removal of C.F., E.F., and D.F. Mr. Rogers testified regarding the contents of the evaluation report, which reflected that Mother was not truthful about her knowledge of K.G.'s father's criminal history, did not accept intervention to address C.F., E.F., and D.F.'s behavior prior to their removal, continued to express a desire to live with K.G.'s father, and wanted to reunify only with K.G. The evaluator was concerned with Mother's lack of candor and desensitization to violence in the home. The evaluator also noted that two of the older children had disclosed that a prior boyfriend of Mother had sexually abused them after Mother had allowed him to reside in the family home. The evaluator concluded that Mother had no insight into her unhealthy relationships, had severe anger management deficits, and had the inclination to prioritize her romantic relationships over her children. The evaluator diagnosed Mother with other specified personality disorder and cannabis use disorder. The recommendations included a psychiatric evaluation, comprehensive mental health treatment, intensive anger management, and Goodwill Parenting classes. The evaluator did not recommend reunification if Mother continued

her relationship with K.G.'s father unless he completed case plan services and was determined to be low risk.

**{¶14}** Mr. Rogers continued to testify that Mother received mental health treatment at Ohio Guidestones and completed approximately thirty-four appointments between March 2024 and at least June 2025. However, he testified that Mother did not meaningfully engage in that treatment. Specifically, Mother was not forthcoming with her counselor about the reasons for the removal of the children and took no accountability for the removal. Mother also continued to withhold from the counselor the fact that K.G.'s father was a registered sex offender. Mother did not complete a required psychiatric evaluation until one month before the permanent custody hearing. Mother was not receptive to any recommended mental health medication.

**{¶15}** Mr. Rogers testified that Mother completed an anger management program through Melymbrosia, and a report detailing her involvement was admitted into evidence. However, the treatment provider continued to have concerns about Mother's ability to manage her anger even after the program's conclusion. The provider described Mother as "manipulative" and did not believe Mother made meaningful progress due to her lack of candor and dishonesty.

**{¶16}** Mr. Rogers testified that although Mother attended the Goodwill Parenting Program, she did not successfully complete it.

**{¶17}** Mr. Rogers testified extensively regarding Mother's relationship with K.G.'s father. He testified that Mother gave each service provider a different account of when she became aware of his sex offender status, demonstrating a lack of candor. C.F., E.F., and D.F. reported that Mother had shown them his court docket and was aware of his status early in the relationship. Mr. Rogers testified that immediately upon K.G.'s father's

release from prison, Mother began having contact with him, including permitting him to come to her home. Mother continued to be dishonest with the Agency and service providers about the nature and extent of that contact. Mr. Rogers testified that this continued contact raised concerns about Mother's ability to protect the children in the future.

{¶18} Mr. Rogers testified that an interpreter was present during all interactions with Mother throughout the case except when Mother specifically elected to proceed without one during her mental health treatment. Ultimately, Mr. Rogers testified that despite the case plan services offered to Mother, he does not believe that Mother made meaningful changes throughout the case. At the conclusion of Mr. Rogers's first-phase testimony, the trial court addressed Mother's Motion to Extend Temporary Custody and orally denied it, stating from the bench: "[E]ach and every concern that was listed at the outset of this case remains a concern today due in part to [the appellant's] lack of personal insight or willingness to change... I do not believe that allowing more time would lead to a different result."

{¶19} Next, Jennifer Fire testified that she is employed by Goodwill Industries as the supervisor of the Goodwill Parenting Program and has held that position for nearly sixteen years. She described the program as meeting four days per week, two-and-one-half hours per day, for eleven weeks, consisting of both classroom instruction and supervised visitation between participants and their children.

{¶20} Ms. Fire testified that Mother participated in the Goodwill Parenting Program. A report detailing Mother's participation was admitted into evidence. Ms. Fire testified that Mother did not gain insight into how she could prevent her children from

being abused in the future, chose to ignore red flags regarding potential paramours, and was not truthful regarding her knowledge of K.G.'s father's status as a sex offender.

{¶21} Ms. Fire testified that Mother initially stated she had missed a class day due to car trouble, but later admitted she had spent that day with K.G.'s father transferring the title of a vehicle. Ms. Fire testified that Mother's decision to spend a class day with K.G.'s father was concerning.

{¶22} Ms. Fire testified that Mother was required to complete three individual goals during the program, but that none of them were accepted because of Mother's lack of candor and failure to acknowledge accountability for the removal of the children. Ms. Fire testified that C.F. refused to visit Mother during the visitation component of the program. During visits that did occur, Mother spent the majority of her time focused entirely on K.G. while ignoring E.F. and D.F. Ms. Fire testified that she did not believe there was a significant bond between Mother and C.F., E.F., and D.F.

{¶23} Ultimately, Ms. Fire testified that Mother did not successfully complete the Goodwill Parenting Program and received the second-lowest possible certification. She attributed this result to Mother's lack of acceptance of responsibility for the removal of her children and her lack of meaningful change throughout the program. Ms. Fire testified that Mother refused to discuss her relationship with K.G.'s father and yelled at the children when they mentioned him during a supervised visit. Ms. Fire further testified that she does not recommend that Mother reengage in the program because she does not believe Mother will make the necessary changes.

{¶24} Mr. Rogers testified again during the hearing regarding the children's placements, relationships, and best interests. He testified that C.F., E.F., and D.F. were initially placed together in the same foster home upon entering the Agency's custody. E.F.

was subsequently placed in a kinship home in September of 2024, and had remained there since. C.F. and D.F. were moved together to a different foster home in March of 2025 and had remained there since. K.G. had been placed in the same kinship home since two days after his birth.

{¶25} Mr. Rogers continued regarding the condition and wellbeing of each child. K.G.'s needs were being fully met in his kinship placement; his only medical concern was a treatable skin condition. D.F. was described as a "really smart kid" with no special needs who had been involved in counseling and mentoring with his foster father. C.F. was "doing really well" in her placement, excelling in school, and participating in track and cross-country. E.F. was also doing well in her kinship placement and excelling in school. The children maintained sibling visitation with one another, and Mr. Rogers testified there was no reason to believe that it would change in the future.

{¶26} Mr. Rogers testified regarding Mother's interactions with the children during visits. He testified that Mother was "fixated" on K.G. during visits and struggled to appropriately interact with all of the children. He testified that E.F. "takes the brunt of [Mother's] anger" during visits. C.F. initially refused to visit Mother but had more recently begun attending visits. Mr. Rogers testified that he does not believe there is a bond between C.F. and Mother, and that the bond between E.F. and Mother is only "somewhat" present.

{¶27} Mr. Rogers also testified regarding the wishes expressed by C.F., E.F., and D.F. He testified that E.F. would like to return home to Mother, but "just wants to have the best life moving forward" and "realizes that going home with Mother may not be a possibility." D.F. was initially upset upon learning of the prospect of permanent custody, but by the time of the hearing stated, "I want to go home, but I like it here as well." C.F.

had been adamant throughout the first year of the case that she did not want to return to Mother, but her stated wishes had become "back-and-forth" in the period leading up to the hearing. Mr. Rogers testified that C.F., E.F., and D.F. stated they were afraid of K.G.'s father and would not want to return home if he were present. They also disclosed having witnessed domestic violence in the home perpetrated by him.

{¶28} Mr. Rogers testified that he believes permanent custody is in the best interests of the children, that the children would benefit from adoption, and that any benefit would outweigh the negative impact of severing Mother's parental rights.

{¶29} Attorney Bond offered a statement during the second phase of the hearing. He echoed Mr. Rogers's testimony regarding the indecisive and conditioned wishes of C.F., E.F. and D.F. Attorney Bond recommends that permanent custody be granted to the Agency as being in the children's best interests.

{¶30} Mother then testified that she believes the children are bonded to her. She denies contact with K.G.'s father after his release from prison, other than a single occasion on which they transferred title of a vehicle. She wishes her children to be returned to her care.

{¶31} The kinship caregiver for K.G. provided a statement at the close of the hearing. She relocated from North Carolina to care for K.G. and is committed to ensuring he has an "amazing life ahead of him."

{¶32} On August 11, 2025, the trial court issued its decision denying the appellant's motions to extend temporary custody, granting permanent custody of the children to the Agency, and terminating the appellant's parental rights.

{¶33} The appellant filed a timely notice of appeal and raised the following two assignments of error:

{¶34} "I. THE TRIAL COURT ERRED IN FINDING THAT THE MINOR CHILDREN COULD NOT BE PLACED WITH MOTHER WITHIN A REASONABLE PERIOD OF TIME."

{¶35} "II. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE MINOR CHILDREN."

## I., II.

{¶36} In her first assignment of error, the appellant argues the trial court erred in finding that the children could not be placed with Mother within a reasonable period of time. We disagree.

## STANDARD OF REVIEW

{¶37} A trial court's decision to grant permanent custody of a child must be supported by clear and convincing evidence. R.C. 2151.414(B)(1). The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty, as required beyond a reasonable doubt, as in criminal cases." *Cross v. Ledford*, 161 Ohio St. 469 (1954).

{¶38} In reviewing whether the trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71 (1990). If the trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. *Schiebel* at 74.

{¶39} Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusions of law." *Id.* Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984): "[t]he underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.*

{¶40} Furthermore, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 1997-Ohio-260.

{¶41} At the same time, this Court is mindful that the permanent termination of parental rights has been characterized as "the family law equivalent of the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991). A parent's interest in the care, custody, and management of her child is among the most fundamental liberty interests recognized by our legal system. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The right to raise a child has been described as an "essential" and "basic" civil right. *In re Murray*, 52 Ohio St.3d 155, 157, (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

## ANALYSIS

### R.C. 2151.414(B)(1)(a) Finding

**{¶42}** R.C. 2151.414(B)(1) provides that a trial court may grant permanent custody to a public children services agency if it determines by clear and convincing evidence that (1) it is in the best interest of the child, and (2) any one of the enumerated threshold circumstances exists. The trial court found that R.C. 2151.414(B)(1)(a) applied—determining that the children are not abandoned or orphaned and cannot be placed with Mother within a reasonable time or should not be so placed.

**{¶43}** R.C. 2151.414(E) sets forth the factors a trial court must consider in making the reasonable-time determination under R.C. 2151.414(B)(1)(a). If the court determines by clear and convincing evidence that one or more of those factors exist as to a parent, it *shall* enter a finding that the child cannot or should not be placed with that parent within a reasonable time. A finding as to any single enumerated factor is independently sufficient to support the threshold determination.

**{¶44}** Mother contends that because she attended the services prescribed by her case plan, including mental health counseling, anger management, and the Goodwill Parenting Program, the trial court erred in concluding she could not be reunified within a reasonable time. She further argues that the eight-month duration of the Agency's temporary custody of the Older Children prior to the filing of the permanent custody motions warranted additional time rather than a permanent disposition. We disagree.

**{¶45}** Mother's argument conflates attendance with achievement. Ohio law has long recognized that the mere completion of the technical requirements of a case plan, absent the underlying behavioral and attitudinal change the plan is designed to produce, does not compel reunification. *See In re D.B.,* 2024-Ohio-1873, ¶64 (5th Dist.). What R.C. 2151.414(E)(1) asks is whether, notwithstanding reasonable case planning and diligent agency efforts, the parent has substantially remedied the conditions that caused removal.

The statute expressly directs the court to consider "parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services." R.C. 2151.414(E)(1). "Where a parent has participated in his or her case plan and completed most or all of the plan requirements, a trial court may still properly determine that such parent has not substantially remedied the problems leading to agency involvement." *Id.*

{¶46} The record contains clear and convincing evidence supporting the trial court's findings under R.C. 2151.414(E)(1), (E)(4), and (E)(14), any one of which independently supports the threshold finding.

{¶47} R.C. 2151.414(E)(1) states:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶48} The conditions that caused the removal of these children centered on three interrelated concerns: (1) Mother's commission of domestic violence against her own children; (2) Mother's inability to protect her children from dangerous individuals she invited into the home, including a convicted sex offender; and (3) Mother's complete

absence of insight into these patterns and their impact on her children. At the conclusion of the permanent custody hearing, each of those conditions remained unremedied.

{¶49} Every service provider who testified expressed continued concern about Mother's capacity to protect her children. Mr. Rogers testified that Mother did not engage meaningfully with mental health treatment, was not forthcoming with her counselor about the reasons for removal and was not receptive to psychiatric medication. The anger management provider found Mother "manipulative" and did not believe she made genuine progress due to dishonesty throughout the program. Ms. Fire testified that Mother received the second-lowest possible certification from the Goodwill Parenting Program—not because she failed to appear, but because she refused to accept any responsibility for her children's removal, refused to discuss her relationship with K.G.'s father, and was observed yelling at the children when they mentioned him during a supervised visit. The parenting evaluator concluded, as reflected in both the report admitted into evidence and Mr. Rogers's testimony, that Mother had no insight into her unhealthy relationships, had severe anger management deficits, and had the inclination to prioritize her romantic relationships over her children. The trial court's oral ruling encapsulates this evidentiary record with precision: "[E]ach and every concern that was listed at the outset of this case remains a concern today due in part to [the appellant's] lack of personal insight or willingness to change * * * I do not believe that allowing more time would lead to a different result."

{¶50} R.C. 2151.414(E)(4) states, "[T]he parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]"

**{¶51}** The parenting evaluator expressly recommended against reunification if Mother continued her relationship with K.G.'s father unless he completed case plan services and was assessed to be low risk. Neither occurred. Yet Mr. Rogers testified that immediately upon K.G.'s father's release from prison, Mother resumed contact with him, permitted him to come to her home, and continued thereafter to provide inconsistent and contradictory accounts to the Agency and each service provider regarding the nature and extent of that contact. C.F., E.F., and D.F. reported that Mother had shown them his court docket, undercutting her claim of ignorance as to his status. Ms. Fire testified that Mother missed a class day to spend time with K.G.'s father transferring the title of a vehicle and was not truthful about it until confronted. The continuation of this relationship in the face of documented risk to these children—and the accompanying pattern of sustained deception across every service provider—constitutes clear and convincing evidence of an unwillingness to provide an adequate and safe permanent home.

**{¶52}** R.C. 2151.414(E)(14) states, "[T]he parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect." Mr. Rogers testified that two of the children had already disclosed prior sexual abuse by a former boyfriend of Mother whom she had permitted to reside in the family home. Rather than demonstrating heightened vigilance in response to those disclosures, Mother continued an intimate relationship with a man convicted of Unlawful Sexual Conduct with a Minor, allowed him to live in the home with her children prior to removal, and immediately resumed contact with him upon his release from prison. The trial court did not abuse its discretion in finding that this sustained pattern of conduct demonstrated an unwillingness to prevent her children from suffering further abuse.

{¶53} We address briefly Mother's argument regarding the eight-month timeline. Mother is correct that the children had been in the Agency's temporary custody for fewer than twelve months before the permanent custody motions were filed. However, no minimum period of Agency custody is required before a motion may be filed under R.C. 2151.414(B)(1)(a). The twelve-month threshold Mother implicitly relies upon applies exclusively to the separate pathway established by R.C. 2151.414(B)(1)(d), which was not the basis for the trial court's decision this case. The relevant statutory inquiry is not whether sufficient time has elapsed, but whether any of the R.C. 2151.414(E) factors are established by clear and convincing evidence. They were.

{¶54} Upon review of the entire record, we find that the trial court had before it clear and convincing evidence to support each required finding under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E).

### Best-Interest Finding

{¶55} R.C. 2151.414(D)(1) directs the trial court to consider all relevant factors when determining whether permanent custody serves a child's best interest, including but not limited to: (a) the interaction and interrelationship of the child with parents, siblings, relatives, foster caregivers, and any other person who may significantly affect the child; (b) the wishes of the child as expressed directly or through the GAL; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether such placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in R.C. 2151.414(E)(7) through (11) apply. No single factor is accorded greater weight than the others. *In re Schaefer,* 2006-Ohio-5513, ¶ 56.

{¶56} Mother contends that permanent custody was not in the children's best interest, pointing principally to the bond between Mother and the children, the expressed ambivalence of C.F., E.F., and D.F. toward permanent custody, the brief duration of Agency custody, and the availability of less-restrictive dispositional alternatives including a planned permanent living arrangement (PPLA) for C.F., E.F., and D.F. Upon examination of each statutory factor in light of the record presented at the hearing, we find the trial court's determination was supported by competent and credible evidence satisfying the clear and convincing standard.

{¶57} **Factor (a) — Interactions and Interrelationships.** Mother testified that she believes the children are bonded to her, and this Court acknowledges that the Agency's own witnesses made statements consistent with some degree of attachment between Mother and the children. We do not discount the significance of the parent-child relationships. However, the testimony of record paints a considerably more complicated picture than Mother's characterization suggests.

{¶58} Mr. Rogers testified that C.F. refused to visit Mother for a substantial portion of the case. During visits that did occur, Mother was observed to focus almost exclusively on K.G. while largely ignoring E.F. and D.F. Mr. Rogers testified that E.F. "takes the brunt of [Mother's] anger" during visits. Mr. Rogers testified that he does not believe a meaningful bond exists between C.F. and Mother, and characterized the bond between E.F. and Mother as only "somewhat" present. Ms. Fire, who observed Mother during eleven weeks of supervised visitation in the Goodwill Program, independently testified that she did not believe a significant bond existed between Mother and C.F., E.F., and D.F.

**{¶59}** By contrast, the record reflects that each child had developed meaningful relationships in their respective placements. Mr. Rogers testified that D.F. had "really taken under his foster father's wing" and was engaged in counseling and mentoring. C.F. was excelling academically and participating in athletics. E.F. was performing well in her kinship placement. K.G., who had never resided with Mother outside a facility, had been placed with the same kinship family since two days after his birth, with caregivers who relocated from out of state to provide his care. This factor, considered on the whole record, weighs in favor of permanent custody.

**{¶60} Factor (b) — Wishes of the Children.** Mother points to C.F., E.F., and D.F.'s expressed ambivalence about permanent custody as evidence that the disposition was not in their best interests. The record reflects, however, that the children's wishes were neither uniform nor static, and must be understood in context.

**{¶61}** Mr. Rogers testified that E.F. would like to return home to Mother, but "just wants to have the best life moving forward" and "realizes that going home with Mother may not be a possibility." D.F. expressed both a wish to return home and contentment with his current placement, stating: "I want to go home, but I like it here as well." C.F. had been adamant throughout the first year of the case that she did not want to return to Mother, though her stated wishes became "back-and-forth" in the period approaching the hearing. Critically, Mr. Rogers testified that C.F., E.F., and D.F. were afraid of K.G.'s father and stated unequivocally that they would not return home if he were present. C.F., E.F., and D.F. also disclosed having witnessed domestic violence perpetrated by him within the home. Given that Mother demonstrated an unwillingness to permanently sever her relationship with K.G.'s father, any wish to return home was necessarily conditioned upon a circumstance the record established was not likely to materialize.

**{¶62}** Attorney Bond, who had direct access to the children throughout the pendency of the case and was charged with representing their interests, independently recommended that permanent custody be granted as being in the children's best interests. Attorney Bond's recommendation, considered alongside the conditioned and contextually qualified nature of the children's stated wishes, does not support Mother's position.

**{¶63} Factor (d) — Need for Legally Secure Permanent Placement.** Mr. Rogers testified that permanent custody is in the best interests of the children and that the benefit of adoption would outweigh the negative impact of severing Mother's parental rights. The trial court, having denied Mother's Motions to Extend Temporary Custody on the record with the finding that additional time would not lead to a different result, and having heard testimony from every service provider expressing continued concern about Mother's capacity to protect her children, determined that a legally secure permanent placement could not be achieved without a grant of permanent custody. All four children required permanency. As to K.G., who had no established relationship with Mother, the need was especially acute. As to C.F., E.F., and D.F., who had experienced domestic violence, exposure to a convicted sex offender, prior sexual abuse, and significant placement disruption, stability and legal permanency were urgent concrete needs that a further extension of temporary custody could not adequately address.

**{¶64}** On these facts and on this record, the trial court's determination that granting the Agency permanent custody was in the children's best interests was supported by competent and credible evidence satisfying the clear and convincing standard.

**{¶65} Factor (e) — Applicable Factors Under R.C. 2151.414(E)(7)-(11).** We note that Mother's domestic-violence-related conduct arising from the incident involving C.F., as reflected in the complaint filed by the Agency and as described in Mr.

Rogers's testimony, is relevant to the broader best-interest analysis. Beyond that specific conviction, the history of domestic violence within the home, the prior sexual abuse of two of the children by a previous boyfriend of Mother as described in the parenting evaluation and Mr. Rogers's testimony, and the recurring pattern of dangerous intimate relationships reinforce the urgency of permanent placement for these children.

{¶66} Having examined the record under each factor set forth in R.C. 2151.414(D)(1), we conclude that the trial court had before it clear and convincing evidence that the grant of permanent custody was in the best interest of all four minor children. The combined weight of the children's demonstrated need for stable and legally secure permanent placement, the fragile or nonexistent bonds between Mother and the children as described by the Agency's witnesses, the conditioned and contextually qualified wishes of the children, the independent recommendation of the Guardian ad Litem, and the absence of any realistic prospect of reunification within a reasonable time fully supports the trial court's best-interest determination. No abuse of discretion has been demonstrated.

{¶67} The appellant's first and second assignments of error are overruled.

## CONCLUSION

{¶68} For the foregoing reasons, the judgment of the Stark County Court of Common Pleas, Family Court Division, is affirmed.

{¶69} Costs assessed to the appellant.

By: Baldwin, P.J.

Popham, J. and

Montgomery, J. concur.